UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MAROC FRUIT BOARD S.A. and WAFA ASSURANCE, S.A.,<br><br>*Plaintiffs,*<br><br>-against-<br><br>M/V VINSON, Her Engines, Machinery, Tackle, Apparel, Appurtenances, etc., *in rem*, and AGDER OCEAN REEFER III AS, *in personam*,<br><br>*Defendants.* | **CIVIL ACTION NO. 10-10306-JLT**<br>**IN ADMIRALTY** |
| MAROC FRUIT BOARD S.A. and WAFA ASSURANCE, S.A.,<br><br>*Plaintiffs,*<br><br>-against-<br><br>SOCIETÉ MAROCAINE DE NAVIGATION MARITIME d/b/a NAVIMAR, S.A.,<br><br>*Defendants.* | **CIVIL ACTION NO. 11-10289-JLT**<br>**IN ADMIRALTY** |

**DECLARATION OF RUNE DYBEDAL IN SUPPORT OF MOTION TO VACATE**

I, Rune Dybedal, declare that the following is true and correct under penalty of perjury under the laws of the United States, pursuant to 28 U.S.C § 1746:

1.    I am a Senior Claims Executive (specializing in cargo claims) with North Insurance Management Ltd., managers of the North of England Protecting and Indemnity Association (the "Association"). The Association is a marine mutual liability insurer which provides protection and indemnity ("P&I") insurance for vessels entered by Members of the Association. The defendant AGDER OCEAN REEFER III, AS ("AGDER") was at all relevant

times, the owner of the M/V VINSON (the "Vessel") and a Member of the Association, which had issued P&I insurance coverage with respect to the Vessel covering the voyage in question.

2.     I make this Declaration in support of the motion submitted by the Vessel and its owner AGDER to alter or vacate the Court's July 9, 2012, Order pursuant to Rule 60(b)(1) and (6) of the Federal Rules of Civil Procedure, so that the Vessel and AGDER may respond to plaintiffs' outstanding discovery demands and may present liability defenses to plaintiffs' cargo claims.

3.     At the outset, on behalf of the Association and AGDER, I wish to give a sincere apology for the circumstances which have led to the necessity to make this application for relief. It was never the intention of the Association or its Member, AGDER to disregard any Orders of this Court, or the discovery obligations imposed by the Rules of this Court, and the Association and AGDER deeply regret and disapprove of the manner in which this case has been handled by its former counsel, Brian B. Kydd.

4.     In my role as a Senior Claims Executive, I communicate with Members of the Association and assist them with the handling of cargo claims, which usually involves the appointment of local counsel and serving as a liaison between local counsel and the Members. I was the individual handling the cargo claim that is the subject of this lawsuit.

5.     In early February 2010, AGDER learned that there might be a potential for cargo claims to be asserted with respect to the carriage of a cargo of clementines aboard the Vessel from ports in Morocco to New Bedford, Massachusetts.

6.     Upon being advised by representatives of AGDER of the potential for claims, on 5 February 2010, I contacted Brian B. Kydd of Kneeland & Kydd, to instruct him to represent

AGDER's and the Vessel's interests and arrange for the appointment of a surveyor to attend the discharge operations when the Vessel called at New Bedford, Massachusetts.

7. Kneeland & Kydd was at the time, one of two correspondents maintained by the Association in the Boston, Massachusetts area. The normal procedure of the Association was to appoint local counsel to assist Members based on the list of correspondents maintained by Association. Kneeland & Kydd had been a correspondent for the Association in Boston for numerous years. I and other claims handlers of the Association had worked with Mr. Kydd before on a number of matters, and there had never been any serious problems with the handling of any matters assigned to the firm or him before.

8. Mr. Kydd accepted the assignment and assisted with arrangements for the surveying of the Vessel, as well as the negotiation and provision of a $2 million Letter of Undertaking by the Association (the "LOU"), in order to secure the release of the Vessel from arrest proceedings commenced by the plaintiffs in this lawsuit. (A copy of the LOU is attached as Exhibit A.)

9. Subsequently, Mr. Kydd represented AGDER and the Vessel in this matter, and continued on this course until 19 July 2012, when he withdrew as counsel in favor of incoming counsel Lyons & Flood, LLP.

10. During the majority of time that Mr. Kydd was serving as counsel in this matter, he appeared to be adequately representing AGDER and the Vessel so far as we were aware. Mr. Kydd regularly communicated with representatives of AGDER and me via e-mail to provide timely advice as to important developments in the case, including negotiations with opposing counsel, the setting of discovery deadlines, and the defense and handling of this matter generally.

11. However, I have since learned that Mr. Kydd was not healthy during this period, and in fact, had been suffering from a psychiatric disorder, causing him to become unable to meaningfully serve as counsel for AGDER and the Vessel in this case.

12. I first observed unusual behavior on the part of Mr. Kydd in May / early June of 2012, when I noticed that he had not provided a response to several e-mail inquiries for nearly a month.

13. Specifically, on 28 March 2012, I wrote to Mr. Kydd to request that he try to reach out to plaintiffs' counsel regarding the possibility of mediating the dispute, and also to inquire about the proposed depositions of representatives of AGDER and the vessel's operational and technical managers. (A copy of my e-mail of 28 March 2012 is attached as Exhibit B.)

14. On 3 May 2012, having not received any response from Mr. Kydd to my inquiries, I wrote another e-mail again requesting that overtures be made to plaintiffs regarding the potential for mediation, and further inquiring about the necessity of conducting the proposed depositions. (A copy of my e-mail of 3 May 2012 is attached as Exhibit C.)

15. On 4 May 2012, Mr. Kydd responded to my e-mail of 3 May 2012, with a brief note simply apologizing for the delay and promising to respond over that weekend. (A copy of Mr. Kydd's e-mail of 4 May 2012 is attached as Exhibit D.)

16. However, Mr. Kydd did not respond over the weekend, which prompted me to write again on 22 June 2012 to again renew the inquiries and demand a response be provided no later than early the following week. (A copy of my e-mail of 22 June 2012 is attached as Exhibit E.)

17. With no response forthcoming, I wrote to Mr. Kydd on 28 June 2012, copying the representatives of the Member, advising that given his non-responsiveness I would be discussing

with the Member the appointment of another attorney to review the matter. (A copy of my e-mail of 28 June 2012 is attached as Exhibit F.) We had also now involved our manager responsible for the service of our correspondents, Mr. Nick Tonge.

18.   On 6 July 2012, I wrote again to Mr. Kydd expressing concern over his failure to respond or communicate regarding the matter, and asked him urgently to telephone me that day. (A copy of my e-mail of 6 July 2012 is attached as Exhibit G.)

19.   On 10 July 2012, after attempting to telephone Mr. Kydd with no response, I wrote to him to again to communicate the urgency of the matter and to request that he telephone me at his first opportunity. (A copy of my e-mail of 10 July 2012 is attached as Exhibit H.)

20.   Having still not received any calls, on 11 July Nick Tonge and I tried to call Mr. Kydd on all available telephone numbers without obtaining contact. Messages to urgently return the calls were left on his voicemail. I also emailed Mr. Kydd on 11 July 2012 with reference to several e-mail messages that had been sent previously as well as the voicemails left for him, to ask that he acknowledge receipt of the message and be available for a telephone conference with myself and Mr. Tonge. (A copy of my e-mail of 11 July 2012 is attached as Exhibit I.)

21.   Finally, on the evening of 16 July 2012, I received a telephone call from Mr. Kydd, breaking over three months of silence. It was during this telephone call that Mr. Kydd first alerted me to his on-going psychiatric and health problems, and that he would be unable to continue representing AGDER and the Vessel in this case. Mr. Kydd told me that he had been hospitalized for an anxiety disorder, which he explained caused him extreme anxiety with respect to Court appearances. He agreed that new counsel should be appointed to protect AGDER's interests and promised full co-operation with the new attorneys that would be appointed.

22. While I did not then learn all of the details of what had transpired in this matter between February 2012 through July of 2012, I understood that Mr. Kydd had seriously failed in his role as counsel for AGDER and the Vessel and that as a result, AGDER's and the Vessel's positions in this case were significantly compromised and prejudiced.

23. After the 16 July 2012 telephone call with Mr. Kydd, I took immediate action to appoint Lyons & Flood as new counsel for AGDER and the Vessel, provided them with instructions to get them up to speed on the developments in this case, and wrote to Mr. Kydd to request that he cooperate with incoming counsel to assist them in taking steps to seek relief from the Court's 9 July 2012 Order. (A copy of my 17 July 2012 e-mail to Mr. Kydd is attached as Exhibit J.)

24. I subsequently learned from Lyons & Flood that plaintiffs' had apparently served discovery requests which had not been complied with, and had subsequently filed motions to compel and for sanctions, resulting in the Court issuing an Order on 9 July 2012, which acted as a liability default against the Member, AGDER.

25. This is the first time in my career with the Association and for over 20 years in the business that I have been faced with this particular situation, where an attorney assigned to represent a Member has suddenly become unresponsive and unreliable to the extent that the case must be re-assigned to another attorney.

26. Prior to the end of June 2012, I did not suspect that anything serious might be wrong with Mr. Kydd or that his handling of the case might be inadequate. Of course, I now know that Mr. Kydd from December of 2011 onward had been failing to report on significant discovery disputes with the plaintiffs.

27. Prior to 16 July 2012, Mr. Kydd had never advised AGDER or the Association of the discovery requests (including requests for admissions) which plaintiffs served in February 2012, or his failure to respond to the discovery requests, nor did Mr. Kydd report on the motions to compel and for sanctions that were filed by plaintiffs, or his own failure to submit oppositions to those motions.

28. I understand that Mr. Kydd is seriously ill and that there may be mitigating circumstances behind his failings. On behalf of the Association, I express my sympathy for Mr. Kydd. However, his actions and inactions have caused AGDER, one of the Association's Members, to suffer prejudice, through no fault of their own.

29. Certainly, had the Association and the Member known what was happening in the lawsuit over the past several months, they would never have ignored the plaintiffs' discovery requests or their motions to compel and for sanctions. This is abundantly clear since the Association had issued a $2 million LOU as security for the Member's liability for these cargo claims. The Association and the Member would not have failed to address plaintiffs' discovery requests and motions to compel and for sanctions as that would prejudice the Association's exposure under the LOU given to the plaintiffs and would prejudice the Member's liability exposure in regard to the approximately $4 million cargo claims submitted by plaintiffs.

30. I have since been advised by Lyons & Flood, AGDER's current counsel, that plaintiffs have also recently made an application for attorneys' fees in connection with the motions to compel and for sanctions which they submitted.

31. Even though the Association and AGDER were not aware of Mr. Kydd's failures in his representation of them, I recognize that plaintiffs and the Court have had to undergo wholly unnecessary work because of Mr. Kydd's failures. The Association will therefore agree

to pay the reasonable attorneys' fees that plaintiffs' have incurred with respect to the motions to compel and for sanctions in an amount to be determined by the Court or as may be agreed between AGDER and the plaintiffs.

32.  AGDER has also agreed to respond fully to the discovery requests which plaintiffs served in February of 2012, as well as to supplement any prior responses as may be needed in order to fully comply with their discovery obligations in this matter.

33.  The Association and the Member, AGDER, are truly sorry for this most unfortunate series of events leading up to the Court's 9 July 2012 Order. On behalf of the Association and the Member, AGDER, I respectfully request that the Court, in the interests of justice, consider setting aside the 9 July 2012 Order, except for imposition of reasonable attorneys' fees above, in order to allow AGDER and the Vessel to have their day in Court and present their liability defenses to the plaintiffs' cargo claims.

Executed on the 10th day of August 2012, at Newcastle upon Tyne, United Kingdom.

_____
Rune Dybedal

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 10, 2012.

By: _____
Kirk M. Lyons (BBO#309630)